UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IRONSHORE SPECIALTY INSURANCE COMPANY | * * | CIVIL ACTION NO. |
| | * | SECTION |
| VERSUS | * | |
| | * | JUDGE |
| T MOORE SERVICES, LLC | * | |
| | * | MAGISTRATE |
| | * | |
| | * | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

**NOW INTO COURT**, through undersigned counsel, comes Ironshore Specialty Insurance Company ("Ironshore") and, for its Complaint for Declaratory Judgment against Defendant, T Moore Services, L.L.C. ("T Moore"), avers with respect as follows:

### I.     NATURE OF THE ACTION

1.

This is an action seeking declaratory relief pursuant to 28 U.S.C. § 2201. An actual controversy of a justiciable nature exists between Ironshore and T Moore concerning the availability and extent of insurance coverage under Environmental Protection Insurance Package Primary Policy number 000253700 ("Ironshore Primary Policy") and Environmental Protection Insurance Package Excess Policy number 000253800 ("Ironshore Excess Policy"). The controversy is of sufficient immediacy to justify the entry of a declaratory judgment.

1

2.

An award of declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

3.

This action seeks declaration that no portion of T Moore's claim for removal of a rig owned by T Moore, RIG 61, which capsized on or about April 30, 2010 in the Charenton Drainage and Navigation Canal and no portion of any third party claim arising out of the capsizing or removal of RIG 61 is covered under the terms and conditions of the Ironshore Primary Policy and/or the Ironshore Excess Policy because:

(a) Neither the Ironshore Primary Policy nor the Ironshore Excess Policy covers any cost or expense incurred by T Moore in the removal of the wreck, RIG 61, which is a risk ordinarily and customarily covered under a Protection and Indemnity Policy, which T Moore, upon information and belief, failed to procure for RIG 61.

(b) Neither the Ironshore Primary Policy nor the Ironshore Excess Policy covers any cost or expense incurred by T Moore in the removal of the wreck, RIG 61, because both "Coverage Part I: COMMERCIAL GENERAL LIABILITY AND POLLUTION LIABILITY Coverage A: General Bodily Injury and Property Damage Liability" of the Ironshore Primary Policy and the Ironshore Excess Policy exclude coverage for bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any watercraft owned by T Moore, including RIG 61.

(c) Neither the Ironshore Primary Policy nor the Ironshore Excess Policy covers any third party claim arising out of the capsizing or removal of the wreck, RIG 61, because Coverage Part I: COMMERCIAL GENERAL LIABILITY AND POLLUTION LIABILITY Coverage A: General Bodily Injury and Property Damage Liability of the Ironshore Primary Policy and Ironshore Excess Policy exclude coverage for bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to

others of any watercraft owned by T Moore, including RIG 61.

(d) The capsizing of RIG 61 did not result in a pollution incident. A pollution incident is a threshold trigger for coverage under Coverage F: Pollution Liability during Transportation. Because the trigger for coverage, a pollution incident, did not occur. Coverage F: Pollution Liability during Transportation is not implicated.

(e) The capsizing of RIG 61 did not involve transportation as defined in the Ironshore Primary Policy and Ironshore Excess Policy. Transportation, as defined in the Ironshore Primary Policy and Ironshore Excess Policy, is a threshold trigger for coverage under Coverage F: Pollution Liability During Transportation. Because the trigger for coverage, transportation as defined in the Ironshore Primary Policy and Ironshore Excess Policy, did not occur. Coverage F: Liability During Transportation is not implicated.

(f) Neither the Ironshore Primary Policy nor the Ironshore Excess Policy covers any cost or expense incurred by T Moore in the removal of the wreck, RIG 61, because the Ironshore Primary Policy and Ironshore Excess Policy exclude coverage for damage to property.

(g) Neither the Ironshore Primary Policy nor the Ironshore Excess Policy covers any third party claim arising out of the capsizing or removal of the wreck, RIG 61, because the Ironshore Primary Policy and Ironshore Excess Policy exclude coverage for damage to property.

(f) Ironshore has no duty to defend any claim against T Moore arising out of the capsizing or removal of RIG 61.

## II.   THE PARTIES

4.

Ironshore is a corporation organized and existing under the laws of the State of

Arizona, with its principal place of business in the State of New York.

5.

T Moore is a limited liability company organized and existing under the laws of the State of Louisiana with its principal place of business in the State of Louisiana.

### III.   JURISDICTION

6.

Federal Jurisdiction exists by virtue of the diversity of citizenship between the parties to this dispute and the amount in controversy exceeding the minimum jurisdictional amount of $75,000, all as required by 28 U.S.C. § 1332.

7.

The Ironshore Primary Policy and the Ironshore Excess Policy were negotiated between T Moore's broker, Brown & Brown of Louisiana, Inc., in the Lafayette, Louisiana area and Ironshore in downtown New Orleans, Louisiana.

### IV.   JUSTICIABLE CONTROVERSY

8.

T Moore procured the Ironshore Primary Policy and Ironshore Excess Policy underwritten by Ironshore with a policy period effective April 25, 2010 at 12:01 a.m. Central Standard Time and with an expiration of April 25, 2011.  These policies are attached to this Complaint for Declaratory Judgment as exhibits "A" and "B" respectively, and the terms, conditions and exclusions set forth in these policies are pled as if incorporated *in extenso* herein.

9.

On May 5, 2010, Ironshore Environmental Claims Department received notice from T Moore, indicating that T Moore had been the owner of a vessel in navigation, RIG

61, which had capsized in a navigable waterway on or about April 30, 2010, a date during the policy period of the Ironshore Primary Policy and the Ironshore Excess Policy respectively.

10.

On May 21, 2010, Ironshore sent a letter to T Moore advising *inter alia* that no claim had been presented as yet to Ironshore which was or would be covered under the terms of the Ironshore Primary Policy or Ironshore Excess Policy.

11.

In response to Ironshore's letter of May 21, 2010, T Moore, through its counsel, wrote Ironshore on June 16, 2010 indicating the insured disagreed with the coverage position set forth by Ironshore in its May 21, 2010 and concluding with the statement "[s]ee you in court."

12.

This matter presents a justiciable controversy because it relates to a loss for which T Moore seeks insurance coverage from Ironshore, advice from Ironshore that the claim as presented is not covered and a response from T Moore threatening litigation against Ironshore.

13.

By virtue of the facts set forth herein, this matter is appropriate for resolution by Declaratory Judgment pursuant to 28 U.S.C. § 2201.

### V.   FACTUAL BACKGROUND

14.

On or about April 5, 2010, the Vice-president and Secretary of The Offshore Drilling Company ("TODCO") executed a Bill of Sale documenting the transfer of ownership of RIG 61, Official No. O.N. 595114, from TODCO to T Moore.

15.

Upon information and belief, T Moore purchased five other watercraft from TODCO in addition to RIG 61.

16.

Upon information and belief, T Moore failed to procure Protection and Indemnity (P&I) Insurance for the watercraft purchased from TODCO, including but not limited to RIG 61.

17.

On or about April 27, 2010, upon information and belief, T Moore contracted with third party tow company(ies) to transport four of the watercraft purchased from TODCO, including RIG 61, to T Moore's property located at 256 Tyler Lane, Franklin LA.

18.

Upon information and belief, T Moore specified that the tow company(ies) needed two hands with eight pumps to pump RIG 61 while it was being transported to T Moore's property located at 256 Tyler Lane, Franklin LA.

19.

On or about April 30, 2010, upon information and belief, the pumps were turned off, were not working properly and/or were not properly manned and RIG 61 began taking on water and ultimately capsized in a navigable waterway.

20.

On or about April 30, 2010, upon information and belief, the capsizing of RIG 61 was reported to the United States Coast Guard.

21.

The Environmental Protection Agency ("EPA") handled the initial response in lieu of the United States Coast Guard; the EPA determined that the capsizing of RIG 61 was

not a pollution incident and turned the matter over to the United States Coast Guard to oversee the wreck removal operations.

22.

T Moore has reported to the Ironshore that the United State Coast Guard is requiring T Moore to remove RIG 61 pursuant to the Wreck Act provisions 33 U.S.C. §409 *et. seq.*

### VI.     THE CLAIM FOR COVERAGE

23.

On or about May 5, 2010, T Moore reported to Ironshore Environmental Claims Department that RIG 61 capsized in the Charenton Drainage and Navigation Canal.

24.

T Moore reported to Ironshore that the United States Coast Guard is demanding that T Moore raise and remove RIG 61 from the Charenton Drainage and Navigation Canal.

25.

On or about May 21, 2010, Ironshore issued a coverage denial letter to T Moore.

26.

On or about June 11, 2010, the President and Owner of T Moore, Tina M. Moore sent correspondence to Ironshore responding to the coverage denial letter advising that "I do understand that [Ironshore] will not pay for the removal of this rig, also please note that I am not asking you to make payment.  I was needing to make sure that the [wreck removal/ salvage contract] would be accepted by the insurance company on which the contract was stating that I would be responsible for any and all pollution."

27.

On or about June 16, 2010, counsel for T Moore sent correspondence to Ironshore stating that T Moore is taking the position that Ironshore provides insurance

coverage for the removal of RIG 61 from the navigable waterway. The correspondence concludes with the statement "[s]ee you in court."

28.

T Moore's counsel has also advised that T Moore anticipates that it expects to be sued by businesses as a consequence of the RIG 62 blocking the navigable waterway, and that T Moore would be looking to have Ironshore defend T Moore in those cases.

### VII.   THE INSURANCE POLICY

29.

T Moore placed primary Environmental Protection Insurance Coverage with Ironshore by virtue of Policy No. 000253700 with an effective date of April 25, 2010 and expiration date of April 25, 2011 (See Exhibit "A").

30.

T Moore placed excess Environmental Protection Insurance Coverage with Ironshore by virtue of Policy No. 000253800 with an effective date of April 25, 2010 an expiry date of April 25, 2011 (See Exhibit "B").

31.

By virtue of the terms of the "Coverage Part I: COMMERCIAL GENERAL LIABILITY AND POLLUTION LIABILITY Coverage A: General Bodily Injury and Property Damage Liability," the Ironshore Primary Policy and Ironshore Excess Policy, which is a following form policy, provides coverage to T Moore, subject to the terms, conditions and exclusions in the respective policies for certain general bodily injury and property damage liability.

32.

Coverage Part I: COMMERCIAL GENERAL LIABILITY AND POLLUTION LIABILITY Coverage A: General Bodily Injury and Property Damage Liability of the

Ironshore Primary Policy and Ironshore Excess Policy is subject to the following relevant exclusion:

    a.    Aircraft, Auto or Watercraft

**Bodily injury** or **property damage** arising out of the ownership, maintenance, use or entrustment to others of any aircraft, **auto** or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and **loading or unloading.**

This exclusion applies even if the **claims** against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the **occurrence** which caused the **bodily injury** or **property damage** involved the ownership, maintenance, use or entrustment to others of any aircraft, **auto** or watercraft that is owned or operated by or rented or loaned to any insured.

33.

Coverage Part I: COMMERCIAL GENERAL LIABILITY AND POLLUTION LIABILITY Coverage F: Pollution Liability during Transportation provides in pertinent part as follows:

**1.**     **Insuring Agreement**

    We will pay those sums that the insured becomes legally obligated to pay as damages to which this insurance applies because of:

    a.    **Bodily injury, property damage** or **environmental damage** including **emergency response expense** arising out of a **pollution incident** during **transportation**; and

    b.    **Bodily injury, property damage** or **environmental damage** including **emergency response expense** arising out of **misdelivery** during **transportation**;

But only if:

(1)    The **bodily injury, property damage** or **environmental damage** is caused by an **occurrence** that takes place in the **coverage territory**; and

(2)    The **bodily injury, property damage** or **environmental damage** takes place during the **policy period.**

34.

Section V – DEFINITIONS provides in pertinent part as follows:

9

**45.** **Transportation** means the movement of goods, product, merchandise, supplies or waste in a **conveyance** by the insured or a third party carrier properly licensed to transport such goods, products, merchandise, supplies or waste from the time of movement from the point of origin until delivery to the final destination. **Transportation** includes the movement of goods, products, merchandise, supplies or waste into, onto or from a **conveyance**.

35.

The Ironshore Primary Policy and Ironshore Excess Policy are subject to the following pertinent Common Exclusion:

b.      Damage to Property

**Property damage** or **environmental damage to:**

(1)   Property you own or operate including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

### VIII.   COMPLAINT FOR DECLARATORY RELIEF

36.

Ironshore repeats and incorporates by reference the allegations set forth in paragraphs 1 through 35 above.

37.

No insurance coverage is available under either the Ironshore Primary Policy or the Ironshore Excess Policy with respect to T Moore's claim for removal of a rig owned by T Moore, RIG 61, which capsized on or about April 30, 2010 in the Charenton Drainage and Navigation Canal and no portion of any third party claim arising from the capsizing or removal of RIG 61 is covered under the terms and conditions of the Ironshore Primary Policy and/or the Ironshore Excess Policy because:

(a)     Neither the Ironshore Primary Policy nor the Ironshore Excess Policy covers any cost or expense incurred by T Moore in the removal of the wreck, RIG 61, which is a risk ordinarily and customarily covered under a Protection and Indemnity

Policy, which T Moore, upon information and belief, failed to procure for RIG 61.

(b)   Neither the Ironshore Primary Policy nor the Ironshore Excess Policy covers any cost or expense incurred by T Moore in the removal of the wreck, RIG 61, because both "Coverage Part I: COMMERCIAL GENERAL LIABILITY AND POLLUTION LIABILITY Coverage A: General Bodily Injury and Property Damage Liability" of the Ironshore Primary Policy and the Ironshore Excess Policy exclude coverage for bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any watercraft owned by T Moore, including RIG 61.

(c)   Neither the Ironshore Primary Policy nor the Ironshore Excess Policy covers any third party claim arising out of the capsizing or removal of the wreck, RIG 61, because Coverage Part I: COMMERCIAL GENERAL LIABILITY AND POLLUTION LIABILITY Coverage A: General Bodily Injury and Property Damage Liability of the Ironshore Primary Policy and Ironshore Excess Policy exclude coverage for bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any watercraft owned by T Moore, including RIG 61.

(d)   The capsizing of RIG 61 did not result in a pollution incident. A pollution incident is a threshold trigger for coverage under Coverage F: Pollution Liability during Transportation. Because the trigger for coverage, a pollution incident, did not occur. Coverage F: Pollution Liability during Transportation is not implicated.

(e)   The capsizing of RIG 61 did not involve transportation as defined in the Ironshore Primary Policy and Ironshore Excess Policy. Transportation, as defined in the Ironshore Primary Policy and Ironshore Excess Policy, is a threshold trigger for coverage under Coverage F: Pollution Liability during Transportation. Because the trigger for coverage, transportation as defined in the Ironshore Primary Policy and Ironshore Excess Policy, did not occur. Coverage F: Liability During Transportation is not implicated.

(f) Neither the Ironshore Primary Policy nor the Ironshore Excess Policy covers any cost or expense incurred by T Moore in the removal of the wreck, RIG 61, because the Ironshore Primary Policy and Ironshore Excess Policy exclude coverage for damage to property.

(g) Neither the Ironshore Primary Policy nor the Ironshore Excess Policy covers any third party claim arising out of the capsizing or removal of the wreck, RIG 61, because the Ironshore Primary Policy and Ironshore Excess Policy exclude coverage for damage to property.

(h) Ironshore has no duty to defend any claim against T Moore arising out of the capsizing or removal of RIG 61.

**WHEREFORE**, plaintiff, Ironshore, respectfully requests that this Court enter declaratory judgment in its favor and against defendant, T Moore Services, LLC, declaring that (a) the parties' rights, duties, status or other legal relations under the Ironshore Primary Policy and Ironshore Excess Policy; (b) any costs or expenses incurred in the removal of the wreck, RIG 61, are not covered under the Ironshore Primary Policy or the Ironshore Excess policy; (c) Ironshore has no duty or obligation to extend insurance coverage, make payment of insurance proceeds or otherwise perform under the Ironshore Primary Policy and/or the Ironshore Excess Policy with respect to the removal of the wreck, RIG 61, or any third party claims arising out of the capsizing or wreck removal of RIG 61; (d) any claims for business interruption or property damage brought against T Moore relating to the blockage of the Charenton Drainage and Navigation Canal as a consequence of the capsizing or removal of RIG 61 are not covered under either the Ironshore Primary Policy or the Ironshore Excess policy; (e) Ironshore has no duty to defend any claim against T Moore arising out of the capsizing or removal of RIG 61;(f) awarding Ironshore all costs of this action; and (g) awarding Ironshore such other and further relief as is just and proper.

Ironshore specifically reserves the right to amend this pleading in accordance with the provisions allowed by law.

Respectfully submitted,

**FRILOT L.L.C.**

*/s Lara N. DiCristina*

_____
**PATRICK J. MCSHANE, T.A.  (#19055)**
**LARA N. DICRISTINA (#27585)**
1100 Poydras Street, Suite 3700
New Orleans, LA 70163-3700
Telephone: (504) 599-8000
Facsimile: (504) 599-8122
Counsel for Ironshore Specialty Insurance Company